UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| SCOTT M. BUTTERFIELD, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-101-RLY-WTL |
| | ) | |
| NAVISTAR INTERNATIONAL | ) | |
| TRANSPORTATION CORPORATION, | ) | |
| PLAN ADMINISTRATOR OF THE | ) | |
| DISABILITY INCOME PLAN, and | ) | |
| INTERNATIONAL TRUCK AND | ) | |
| ENGINE CORPORATION, | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and
DEFENDANTS' MOTION TO STRIKE EVIDENTIARY MATERIAL NOT
SUBMITTED TO PLAN ADMINISTRATOR**

Plaintiff, Scott M. Butterfield ("Plaintiff"), brings a claim under the Employee

Retirement Income Security Act ("ERISA") of 1974, 29 U.S.C. §§ 1001-1461, alleging

that the Defendants, Navistar International Transportation Corporation, plan administrator

of the disability income plan ("Navistar"), and International Truck and Engine

Corporation ("ITE") (collectively "Defendants" or "the Company"), intentionally

interfered with his attainment of long-term disability benefits (Count I) and wrongfully

denied his ability to attain long-term disability benefits (Count II).  Defendants now move

for summary judgment, and, relative to that motion, also move to strike the evidentiary

materials submitted by the Plaintiff in support of his position which were not submitted to

1

the Company prior to making its final determination.  For the reasons set forth below, the court **GRANTS** Defendants' motion for summary judgment and **GRANTS** Defendants' motion to strike.

## I.     Motion to Strike

Defendants move to strike the following exhibits submitted by Plaintiff in support of his opposition to their summary judgment motion: (1) the Affidavit of Dr. John Joven dated August 28, 2007 (Plaintiff's Ex. P); (2) the Affidavit of Dr. Robert Klinestiver dated August 22, 2007 (Plaintiff's Ex. Q); (3) the Social Security Disability Determination and Transmittal dated January 19, 2006 (Plaintiff's Ex. N); and (4) the Social Security Administration Office of Hearings and Appeals Decision, dated December 20, 2005 (Plaintiff's Ex. O).  Defendants so move on grounds that these exhibits were not before the plan administrator at the time it made its decision to terminate Plaintiff's short-term disability benefits – in January 2004.  Defendants also contend that the determination by the Social Security Administration ("SSA") is irrelevant to the court's determination in this ERISA case.

The parties agree that the proper standard of review in this case is the arbitrary and capricious standard of review, as the plan administrator was given the discretion to interpret and construe the terms of the Disability Plan (the "Plan") at issue.  (*See* Section III.B).  This is a very deferential standard of review, and, absent evidence that the plan administrator wholly disregarded the merits of the Plaintiff's claim, the court's review is limited to the record that was before the plan administrator at the time it made its benefits

determination.  *Perlman v. Swiss Bank Corp.*, 195 F.3d 975, 981-82 (7th Cir. 1999).

> Courts in the majority have allowed, . . . that discovery may be appropriate
> to investigate a claim that the plan's administrator did not do what it said it
> did – that, for example, the application was thrown in the trash rather than
> evaluated on the merits.  But when there can be no doubt that the
> application was given a genuine evaluation, judicial review is limited to the
> evidence that was submitted in support of the application for benefits, and
> the mental processes of the plan's administrator are not legitimate grounds
> of inquiry any more than they would be if the decisionmaker were an
> administrative agency.

*Id*. at 982.

There is no evidence in the record that the Company did not give Plaintiff's

disability claim a "genuine evaluation."  *See* Section III.B.  The Company considered the

record before it, and credited the opinion of an independent medical examiner, Dr. Robert

Shellman ("Dr. Shellman"), over Plaintiff's treating physicians.  This the Company had

the discretion to do.  *See Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir.

2006) ("[R]eaching a decision amid such conflicting medical evidence is a question of

judgment that should be left to [the plan administrator] under the arbitrary-and-capricious

standard of review.");  *Semien v. Life Ins. Co. of N. Am*, 436 F.3d 805, 812 (7th Cir. 2006)

("Although Semien's treating physicians reached different conclusions as to her abilities,

under an arbitrary and capricious review, neither this Court, nor the district court, will

attempt to make a determination between competing expert opinions.").  Accordingly, the

court is required to exclude any and all evidence that was not a part of Plaintiff's

disability file in January 2004.

Moreover, the decision of the SSA is not relevant to the issue before the court.

SSA determinations are measured against a uniform set of federal criteria, while ERISA

disability determinations turn on interpretation of the particular plan at issue. *Marshall v.*

*Blue Cross Blue Shield Ass'n*, 2006 U.S. Dist. LEXIS 68956, at *103 (N.D. Ill. Sept. 13,

2006). In addition, the SSA determination has no relevance where it was made at a

different point in time and was based on new and different information from that

submitted to the plan administrator. Defendants' motion to strike Plaintiff's Exhibits P,

Q, N, and O is therefore **GRANTED**.

## II.    Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue of material fact and that the moving party is entitled to a judgment as

a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment,

a court must draw all reasonable inferences in the light most favorable to the non-movant.

*See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). The court's

function is not to weigh the evidence and determine the truth of the matter, but to

determine whether there is a genuine issue for trial. *See Payne v. Pauley*, 337 F.3d 767,

770 (7th Cir. 2003).

In determining whether a genuine issue of material fact exists, the court must view

the record and all reasonable inferences in the light most favorable to the non-moving

party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). The moving party bears the

burden of demonstrating the "absence of evidence on an essential element of the non-

moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-

moving party may not, however, simply rest on the pleadings, but must demonstrate by

specific factual allegations that a genuine issue of material fact exists for trial. *Green v.*

*Whiteco Industries, Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at

322)).

## III.    Facts

1.    ITE is a leading producer of mid-range diesel engines, medium and heavy trucks,

service vehicles, and parts. (Affidavit of Steve Metz ("Metz Aff.") ¶ 3). Its

Brookville Road facility in Indianapolis, Indiana, includes the Engine plant, which

employs about 800 people, and the Foundry, which employs approximately 500

people. (*Id.*).

2.    Navistar is a holding company for all of its operating companies, including ITE,

and is the named plan administrator of the benefit plan offered to employees

represented by the United Plan Guard Workers of America. (*Id.* ¶ 5).

### A.    ITE's Disability Benefit Plan

3.    Disability benefits available to employees represented by the United Plan Guard

Workers of America are described in the Plan and the Summary Plan Description

("SPD"). (*Id.* ¶¶ 5, 17; *Id.* Exs. A, C).

4.    The Plan provides that the Company shall be responsible for the general

administration of the Plan and for carrying out its provisions. (*Id.* Ex. C, ¶ 6).

5.    It further states that the Company "may delegate to various officers, employees

5

and committees of the Company authority, as well as the right of delegation, to

carry out such of its responsibilities as it deems proper . . ."  (*Id*. Ex. C, ¶ 7).

6.      The SPD states that the plan administrator has the "discretion to interpret the terms

of the plans."  (*Id*. Ex. A at 3).

7.      Under the Plan, an employee is eligible for short-term disability benefits, not to

exceed 52 weeks, if he or she is "unable to perform his or her regular job or any

other job in his bargaining unit" and is under a physician's care.  (*Id*. Ex. A at 118-

19; *Id*. Ex. C at 12-13).

8.      An employee who exhausts 52 weeks of short-term disability and "during a

continuous period of disability thereafter is totally disabled" – meaning "the

employee has become wholly incapable of performing work" – is eligible for long-

term benefits, within specified requirements.  (*Id*. Ex. A at 119; *Id*. Ex. C at 21).

9.      Long-term disability benefits require medical proof of "sufficient severity that any

person so afflicted" would be wholly incapable of doing work.  (*Id*. Ex. C at 28).

An employee who ceases to be disabled is not entitled to long-term benefits.  (*Id*.

Ex. C at 28).

10.     An employee claiming disability is responsible for informing the Company of the

claim to initiate short-term disability benefits.  (*Id*. Ex. C at 16, ¶ 5).  The Plan

requires employees to provide written medical evidence of disability from a

physician, and reserves the right to withhold disability payments "until satisfactory

medical evidence of disability is furnished."  (*Id*. Ex. C at 16, ¶ 56).  To satisfy this

requirement, medical evidence must consist of "objective medical observations, physical findings, or laboratory or X-ray tests of other positive evidence sufficient to establish the existence of disability and supportive to a proper diagnosis of a constitutional disease."  (*Id*.).

11. The Plan provides that in the event the Company and the employee's physician disagree as to the appropriate duration of disability for the health condition at issue, the Company can opt for an independent medical examination ("IME") to determine whether the employee has sufficiently recovered to return to work.  (*Id*. ¶ 17; *Id*. Ex. C at 16, ¶ 57).

12. The Plan expressly states that the determination resulting from the IME "shall be binding upon the Company and the employee."  (*Id*.).

**B.    ITE's On-Site Medical Department**

13. ITE's Indianapolis plant houses an on-site medical department to address employees' medical and benefits needs. (*Id*. ¶ 4; Affidavit of Lisa Bonnewell ("Bonnewell Aff.") ¶ 5).

14. In 2003 and early 2004, Steve Metz ("Metz"), the Safety and Medical Resource Leader, supervised the medical clinic and oversaw the health, safety, and disability aspects of the Indianapolis plant.  (Metz Aff. ¶ 4).

15. Metz supervised Lisa Bonnewell ("Bonnewell"), a registered nurse and the medical department's Disability Case Manager.  (*Id*. ¶ 7; Bonnewell Aff. ¶¶ 3, 4). As Disability Case Manager, Bonnewell was responsible for managing all short-

term disability claims, counseling employees and monitoring their progress, and helping them with necessary disability paperwork.  (Bonnewell Aff. ¶ 4).

16.    Dr. James Johnson ("Dr. Johnson") became the clinic's Medical Director in July 2003 and held that position throughout Plaintiff's disability leave.  (Deposition of Dr. James Johnson ("Johnson Dep.") at 41).  During this time, he was aware and discussed every open short-term disability case at ITE with Bonnewell on a regular basis.  (Bonnewell Aff. ¶ 6; Johnson Dep. at 102-05).

17.    One of the tools used by Bonnewell to monitor and manage open disability claims is a set of guidelines known as the Presley-Reed guidelines.  (Bonnewell Aff. ¶ 9). These guidelines help occupational health practitioners determine the average or expected amount of time an employee could be expected to remain off work for particular medical problems.  (*Id*.).  In addition to these guidelines, Bonewell met with each employee as needed to discuss their progress and obtained a monthly status report completed by the treating physician.  (*Id*. ¶¶ 11,12).

18.    The medical department did not handle long-term disability claims, as such claims were overseen by the Springfield, Ohio, facility.  (*Id*. ¶ 4).

**C.    Plaintiff's Short-Term Disability Claim**

19.    Plaintiff was employed as a Loss Prevention Specialist at ITE from April 1997 until October 1, 2003, when the Company began outsourcing its loss prevention work.  (Deposition of Scott M. Butterfield ("Plaintiff Dep.") at 15-17, 19).  He was a member of the union representing ITE's plant guard employees and served as a

union steward in the fall of 2003.  (*Id*. at 28).

20.   On August 12, 2003, Plaintiff was seen by his cardiologist,[1] Dr. Gary Fisch ("Dr.

Fisch"), to evaluate his complaints of chest pains.  (Defendants' Ex. 3).  At that

time, Plaintiff advised Dr. Fisch that he was unable to perform his job and was

hoping to obtain disability benefits.  (*Id*.).

21.   Dr. Fisch examined Plaintiff and determined that Plaintiff's heart function was

normal.  (*Id*.).  He recommended that Plaintiff see a pulmonologist regarding the

complained-of chest pains since they were not heart-related.  (*Id*.; Plaintiff Dep. at

103-05).  Plaintiff then followed up with his family doctor, John Joven ("Dr.

Joven"), on August 18, 2003.  Dr. Joven referred Plaintiff to a pulmonologist,

Robert Klinestiver ("Dr. Klinestiver"), "for further evaluation of his chest pains"

as Dr. Fisch had "cleared him from a cardiology standpoint."  (Defendants' Ex. 9).

22.   In early September 2003, Plaintiff underwent pulmonary testing of his lungs, as

well as sleep latency and sleep apnea tests.  (Plaintiff Dep. at 109-12).  The

pulmonary tests revealed that Plaintiff's lung function was normal, and his sleep

test results indicated a mild sleep abnormality (including sleep disordered

breathing and possible narcolepsy) that could possibly be caused by his long-term

shift schedule.  (*Id*. 111-12; Bonnewell Aff. Exs. E, F).

23.   On September 15, 2003, Plaintiff presented ITE with a note from Dr. Joven

---

[1] Plaintiff suffers from a chronic heart condition.  In 2000, Plaintiff had a heart valve replaced and took short-term disability leave.  He was released to return to work approximately three months after the surgery.  (Plaintiff Dep. at 30-31).

stating, "Patient is unable to work at this time due to his medical problems.  He will be cleared after further examination by Dr. Robert Klinestiver and myself." (Bonnewell Aff. ¶ 10; Bonnewell Aff., Ex. B).

24.  Upon receiving the statement from Dr. Joven, Bonnewell gave Plaintiff the paperwork required in order to receive short-term disability benefits.  (*Id*. ¶ 10).

25.  Plaintiff then provided an Attending Physician's Statement signed by Dr. Joven stating that he should be on restricted duty for 90 days with "[n]o climbing stairs or excessive running," with "[f]urther workup and treatment in conjunction with Dr. Robert Klinestiver, pulmonology."  (*Id*., Ex. B).

26.  Pending Dr. Klinestiver's recommendations, Dr. Joven filled out a Return to Work Medical Release, restricting him to ground work only, on September 19, 2003. (*Id*.).  At that time, Dr. Joven diagnosed Plaintiff with "obstructive sleep apnea, hypertension, aortic stenosis with artificial heart valve, depression."  (*Id*.).  On the following page, under the heading "Assessment," Dr. Joven listed "depression, obstructive sleep apnea, and chest pain."  (*Id*.).

27.  On October 1, 2003, approximately two weeks after Plaintiff began his disability leave, the contract under which Plaintiff and the other plant guards were employed expired.  (Metz Aff. ¶¶ 8, 9; Metz Aff., Ex. 2).  Nonetheless, Plaintiff continued to receive short-term disability benefits from Navistar.  (*Id*. ¶ 12; Plaintiff Dep. at 78).

28.  Plaintiff updated Bonnewell on his condition every thirty days.  (Plaintiff Dep. at

49).  He met with Bonnewell on September 22, October 22 and 31, November 21, and December 17, 2003, and on January 13, 2004, to discuss the progress of his sleep apnea.  (Bonnewell Aff. ¶ 13).

29.   On October 30, 2003, Plaintiff presented Bonnewell a Benefits Extension Statement completed by Dr. Klinestiver in which Dr. Klinestiver diagnosed Plaintiff with sleep shift-phase disorder, obstructive sleep apnea, and chronic anxiety.  (Bonnewell Aff. Ex. D).  Although Plaintiff's sleep study conducted in September 2003 indicated mild sleep apnea, Dr. Klinestiver recommended that Plaintiff not return to work until February 1, 2004, and "probably longer." (Bonnewell Aff. ¶¶ 12, 13, 15; Bonnewell Aff. Ex. D-1).

30.   On November 18, 2003, Dr. Klinestiver filled out another Return to Work Medical Release for Plaintiff and listed the following under the Diagnosis section: "sleep apnea/sleep disturbances, respiratory abnormality, anxiety disorder, trachea/bronch. disease, tobacco use."  (*Id*. Ex. D-2).  Dr. Klinestiver noted that Plaintiff was "unsuitable for any available work" and recommended that Plaintiff remain off work "indefinitely."  (*Id*.).

31.   Upon receiving the status reports from Dr. Klinestiver, Bonnewell became concerned about Plaintiff's disability status for several reasons.  First, Bonnewell believed that Plaintiff had been off work for longer than the Presley-Reed guidelines indicated for his sleep disorder.  Second, the objective findings from Plaintiff's pulmonary testing and sleep studies conducted at Community Hospital

in September 2003 indicated that Plaintiff's lung functions were normal and that he suffered from only a mild case of sleep apnea and possible narcolepsy.  Dr. Marvin Vollmer, who conducted the sleep studies at Community Hospital, also noted that Plaintiff's results "could just reflect chronic sleep deprivation and/or a sleep cycle disturbance" related to his chronic night shift work pattern. (Bonnewell Aff. Ex. F).  Third, Bonnewell read Dr. Klinestiver's reports as being based upon Plaintiff's subjective statements rather than any additional objective findings.  Finally, Plaintiff's statements to Bonnewell about his symptoms during his progress visit consultations were purely subjective.  (*Id*. ¶¶ 13-16).

32.  Bonnewell discussed these concerns with Dr. Johnson[2] and Metz, and they agreed that it would be helpful to obtain an opinion from an independent physician to help clarify Plaintiff's disability status and to determine whether he remained eligible for short-term benefits.  (Metz Aff. ¶¶ 15-16; Johnson Dep. at 108-11; Bonnewell Aff. ¶ 17).

33.  On December 17, 2003, Metz sent a letter to Plaintiff advising him that an IME had been scheduled with Dr. Shellman on January 9, 2004.  (Metz Aff. ¶ 19; Metz Aff. Ex. D).

### D.     The Independent Medical Examination

---

[2] Dr. Johnson testified that he did not recall discussing Plaintiff's case with Bonnewell. He testified, however, that "[t]he content of the note implies that she made me - - and my initials imply that I was aware of the content, the diagnosis and the progress and the plans.  And it was not that unusual for people to go out and get another further exam."  (Johnson Dep. at 111).

34.  Dr. Shellman is a board certified physician in internal, pulmonary, critical care, and sleep medicine, with a specialty in pulmonary, critical care and sleep medicine.  (Deposition of Dr. Robert Shellman ("Shellman Dep.") at 15-16).

35.  Dr. Shellman has no affiliation with ITE.  His examination of Plaintiff was the first IME he had ever performed at the request of ITE.  (*Id*. at 26-28).

36.  Dr. Shellman examined Plaintiff on January 9, 2004.  During this examination, he performed a spirometry – a test in which the patient breathes deeply into a machine that measures lung function – on Plaintiff.  (*Id*. at 33-34).  Dr. Shellman also had Plaintiff walk for six minutes with an oximeter to measure his blood oxygen levels. (*Id*. at 33-36).  He performed pulmonary function tests and reviewed Plaintiff's medical disability file, including records from the previous pulmonary and sleep tests.  (*Id*.).

37.  At the conclusion of his examination, testing and review of the records, Dr. Shellman determined that Plaintiff's complained-of shortness of breath was secondary to his obesity, and not related to his pulmonary functions. (*Id*. at 35, 42). He also observed that Plaintiff's symptoms were out of proportion with the results of the objective tests and concluded that the other symptoms of which Plaintiff complained were caused by his sleep condition, which was adequately controlled with the use of a CPAP.  (*Id*. at 39, 44, 58).  Dr. Shellman did not conduct any cardiac testing on Plaintiff because a review of Plaintiff's records showed that he had been examined by a cardiologist and a cardiovascular surgeon, who both

13

found that his symptoms were not related to any outstanding cardiac concerns.  (*Id*.
at 40-41, 52).

38.    Dr. Shellman sent the results of the examination to, among others, the ITE medical
department.  (*Id*. at 46-47; Metz Aff. ¶ 19; Metz Aff. Ex. E).

39.    Based on his conclusion that Plaintiff was not limited by his sleep apnea, which
was adequately controlled, or by his lung function, Dr. Shellman recommended
that Plaintiff was fit to work.  (Shellman Dep. at 48, 65, 69; Metz Aff. ¶ 19; Metz
Aff. Ex. E).

40.    Based upon this IME, Metz determined that Plaintiff no longer was disabled and
that his benefits should therefore be discontinued.  (*Id*. ¶ 19).  On January 22,
2004, he sent a letter to Plaintiff informing him of the decision.  (*Id*. Ex. F).
Metz's letter also reminded Plaintiff that the loss prevention department had been
outsourced on October 1, 2003, and consequently, Plaintiff no longer had a
position with ITE in January 2004.  (*Id*.).

41.    Plaintiff did not apply for long-term disability benefits.  (Butterfield Dep. at 31).

**IV.    Discussion**

**A.    Plaintiff's Claim for Interference**

In Count I of Plaintiff's Complaint, Plaintiff alleges that the Defendants interfered
with the attainment of his long-term disability benefits by terminating his employment.
Defendants contend this claim is not adequately pled, citing paragraphs 1 and 4 of his
Complaint.  Although Plaintiff fails to allege his interference claim in paragraphs 1 and 4

14

of his Complaint, he clearly alleges a claim for interference in Count I of his Complaint. Indeed, Count I is entitled "Interference with the Attainment of an Employee's Welfare Benefit Rights in Violation of the Employee Retirement Income Security Act."  In addition, paragraph 18 of the Complaint incorporates paragraphs 1-17 of the Complaint, and "alleges that Defendants' conduct intentionally interfered with his attainment of long-term disability in violation of ERISA."  (Complaint ¶ 18).  The conduct of which Plaintiff complains is Defendants' decision to terminate his employment.  (*Id*. ¶ 20).  Defendants' argument is therefore without merit.

Defendants did not argue the merits of Plaintiff's Section 510 claim; they merely assert that "there are no facts to support a claim that he was discharged or denied employment in order to deprive him of participation in an employee benefit plan." (Defendant's Reply at 3).  Although Defendants did not substantiate their argument, the court finds, from the undisputed facts in this case, that Plaintiff's claim is without merit.

ERISA Section 510 governs Plaintiff's claim, and provides that it is unlawful to interfere with an employee's benefits that are protected under ERISA.  Specifically, that Section reads, in pertinent part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan.

29 U.S.C. § 1140.  To prevail on a Section 510 claim, a plaintiff "must demonstrate that [his] employer[] terminated [him] with the specific intent of preventing or retaliating for

15

the use of benefits." *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998).

Plaintiff's only evidence to support his ERISA claim is Metz's testimony that whether the Indianapolis plant exceeded its short-term and/or long-term disability cost goals was one component of his "Total Performance Management" evaluation.  Plaintiff thus appears to be alleging that Metz's decision to terminate his position was driven by cost containment goals.  However, there is no evidence connecting the fact that Metz, as the Human Resources Manager, is required to contain short-term and long-term disability costs, and Metz's decision to cut-off Plaintiff's short-term disability benefits on grounds that Plaintiff was no longer "disabled" under the terms of the Policy.  Instead, the undisputed evidence shows that Plaintiff's position as a security officer was outsourced to a private company in October 2003.  Thus, there is no evidence that Plaintiff was terminated due to his exercise of rights under ERISA.  Defendants' motion for summary judgment is therefore **GRANTED** on Count I of Plaintiff's Complaint.

**B.      Plaintiff's Denial of Benefits Claim**

In Count II, Plaintiff "alleges that Defendants' wrongfully denied his ability to attain long-term disability benefits in violation of ERISA." (Complaint ¶ 23).  The Plan provides that long-term disability benefits are available to an employee who has exhausted 52 weeks of disability and continues to be wholly disabled.  Plaintiff did not make the 52-week requirement, and therefore, did not qualify for long-term disability benefits.

To the extent that Plaintiff's Complaint can be read to include a wrongful denial of

Plaintiff's short-term disability benefits, Plaintiff's claim is similarly unavailing.  The

parties agree that pursuant to the terms of the Plan, the plan administrator has the sole

discretion to construe and interpret the provisions of the Plan.  Accordingly, the court

reviews the Company's decision to deny Plaintiff continued short-term disability benefits

under the arbitrary and capricious standard of review.  *Brehmer v. Inland Steel Indus.*

*Pension Plan*, 114 F.3d 656, 660 (7th Cir. 1997) (*citing Firestone Tire & Rubber Co. v.*

*Bruch*, 489 U.S. 101, 110-11 (1989); *Trombetta v. Cragin Fed. Bank for Savings ESOP*,

102 F.3d 1435, 1437 (7th Cir. 1996)).  Under that standard, the court will uphold the plan

administrator's decision "so long as [it] has 'rational support in the record.'"  *Davis*, 444

F.3d at 576 (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)).

"Questions of judgment are left to the plan administrator, and it is not [the court's]

function to decide whether [it] would reach the same conclusion as the administrator."  *Id.*

(internal citations omitted).  "'Absent special circumstances such as fraud or bad faith, the

[plan administrator's] decision may not be deemed arbitrary or capricious so long as it is

possible to offer a reasoned explanation, based on the evidence, for that decision.'"

*Semien*, 436 F.3d at 812.

In assessing a case under the arbitrary and capricious standard of review, the court

may take into account four factors: "the impartiality of the decision making body, the

complexity of the issues, the extent to which the decision makers utilized the assistance of

experts where necessary, and finally the soundness of the fiduciary's ratiocination."

*Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995).  Plaintiff contests all

factors.

First, Plaintiff argues that ITE is not an impartial decision maker "because it is a self-insured entity for short-term disability and long-term disability claims" and because, as noted above, Metz testified that he was evaluated by his superiors on whether the Indianapolis plant met its short- or long-term disability goals.

The Seventh Circuit has considered and rejected such attenuated claims of bias, holding that "the 'presence of a conflict of interest does not change the standard of review.'" *Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 660 (7th Cir. 2005) (quoting *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 960 (7th Cir. 2001)). Rather, the Seventh Circuit requires "specific evidence of actual bias that there is a significant conflict." *Id.*

In *Hess*, the plaintiffs argued that the Seventh Circuit's standard of review should be more searching because the officers and directors on the committee that approved the denial of their claims had an inherent conflict of interest since any decision to award benefits would adversely affect the company's bottom line. The Seventh Circuit noted that "we have repeatedly rejected arguments for a heightened standard of review solely because a corporation or insurer interprets its own plan to deny benefits." *Id.* at 659. The Court explained that "in those cases in which we have rejected plaintiffs' claims of bias, we have done so in part because a decision to award benefits in those cases would have had a minimal effect on the companies' financial well-being." *Id.* Although the plaintiffs submitted undisputed evidence that granting the plaintiff's claim would affect the

company's bottom line, giving the Court "pause," the Court concluded, "Thus, we bear in mind the possibility that the committee had an interest in denying the Hesses' claim, but the pertinent question remains whether its decision was arbitrary and capricious." *Id*. at 660.

In this case, Plaintiff's evidence is insufficient to show actual bias on the part of ITE. Although Metz testified that the Company watched its expenditures on short- and long-term disability claims (as well as workers compensation and other employee claims), there is no evidence that the termination of Plaintiff's short-term disability benefits had more than a minimal effect on the Company's bottom line. As Metz states in his affidavit, the Indianapolis plant employs approximately 1,300 people and has an average of about 35-40 employees per month who receive short-term benefits. (Metz Aff. ¶ 3).

Moreover, the fact that one component of Metz's performance evaluation relates to whether the Indianapolis plant exceeds annual cost goals for items such as short- and long-term disability and workers' compensation is not evidence of bias but rather simply indicates that the Company, like most companies, strives to manage expenses. There is no evidence that Metz was compensated for denying disability claims or that his salary was directly impacted by attaining or failing to attain those goals. (Supplemental Affidavit of Steve Metz ¶ 4).

Second, Plaintiff argues that his chronic health conditions were complex and interrelated. Plaintiff cites to ITE's RiskEnvision 3.2 records for the proposition that Plaintiff was placed on short-term disability for depressive disorder, unspecified sleep

apnea, other and unspecified coagulation defects, benign hypertension and aortic valve

disorder, along with heart complications.  (*See* Plaintiff's Ex. B).  Although Plaintiff

produced a copy of the RiskEnvision 3.2 document and submitted it as Plaintiff's Ex. B,

neither party submits evidence of what the RiskEnvision 3.2 records actually are and if

and/or how they are used by the Company is making a benefits determination.[3]

That said, the Plan required Plaintiff to provide objective medical evidence

supportive of his claim.  (Metz Aff. Ex. C at 16, ¶ 56).  The objective medical evidence

before the Company reflected that Plaintiff's cardiologist, Dr. Fisch, evaluated Plaintiff in

August 2003 and determined that Plaintiff's heart function was normal, and that his

subjective chest pain complaints were not related to his chronic heart condition.

(Defendant's Ex. 3).  Upon the recommendation of Dr. Fisch, who "cleared Plaintiff from

a cardiology standpoint," Plaintiff saw his family physician, Dr. Joven, who ordered a

sleep study and referred Plaintiff to a pulmonologist for evaluation and to determine if the

complained-of chest pains were related to his lung function.  On October 30, 2003, Dr.

Klinestiver completed Plaintiff's Disability Benefits Extension Statement, and listed,

under Diagnosis, "sleep shift-phase disorder, obstructive sleep apnea, chronic anxiety."

---

[3] In the Company's Reply Brief, it explains that the medical codes in Envision are not
determinative as that program was only used to track payments and not for substantive
management of claims.  The Company further states that the codes are entered into Envision at
the outset of the employee's leave by a Human Resources representative based upon what the
employee told the representative or on preliminary documentation submitted by the employee.
The Company cites to Bonnewell's affidavit as support for these factual averments, however, her
affidavit vaguely alludes to "intake records," and not specifically to the RiskEnvision 3.2
records.  (*See* Bonnewell Aff. ¶ 7).  Thus, the court gives no weight to her testimony.

His recommended treatment plan called for "Nasal CPAP therapy; sleep schedule alterations; angiolytic therapy; Referral to psychiatrist." (Bonnewell Aff. Ex. D at 4). Thus, the records submitted to and considered by the Company were focused on Plaintiff's pulmonary issues, having ruled out Plaintiff's chronic heart condition as a cause. Plaintiff himself admitted that he did not submit any documentation to the Company from his cardiologist. (Plaintiff Dep. at 52-53). Accordingly, the court finds Plaintiff's health issues were not inordinately complex, and were properly considered by the Company.

With respect to the third factor – consultation of necessary experts – Plaintiff argues that the Company excluded its in-house medical expert, Dr. Johnson, from the analysis, and limited the only other expert it retained – Dr. Shellman – to an analysis of Plaintiff's sleep apnea. Although Dr. Johnson testified that he did not recall discussing Plaintiff's case, Dr. Johnson concedes that he initialed Bonnewell's progress notes relating to Plaintiff, thus indicating to Dr. Johnson that Bonnewell discussed the case with him. (*See* Johnson Dep. at 108 ("And all this tells me is that [Bonnewell] gave me a quick run-by of progress with this case and I got to look at the entries or the diagnoses and the plans, and I was okay with that at the time."). Dr. Johnson further testified that he and Bonnewell met either every day or three times a week during the relevant time period to discuss the status of every pending short-term disability matter. (*Id.* at 105).

Plaintiff's charge against Dr. Shellman is equally without merit. Dr. Shellman, who specialized in pulmonary conditions and sleep disorders, rendered his opinion after personally examining Plaintiff and after reviewing Plaintiff's medical records. (*See* Metz

Aff. Ex. E at 1 ("A complete review of systems was performed and documented.").  Dr. Shellman did not focus only on Plaintiff's sleep apnea; he also considered, *inter alia*, Plaintiff's complaints of shortness of breath, depression, and daytime sleepiness.  (*Id*. at 1-2; Shellman Dep. at 39, 42).  He did not reach any conclusions regarding Plaintiff's heart condition, as Plaintiff's medical records indicated that Plaintiff had been cleared by his cardiologist.  (Shellman Dep. at 41).

Finally, Plaintiff challenges the ratiocination of the Company's decision to deny him benefits.  Under the arbitrary and capricious standard of review, it is not for the court to question the judgment of the Company, but merely to determine whether it had a rational basis for determining that Plaintiff was fit to work.

As stated previously, the records focused on Plaintiff's pulmonary issues, and those issues were addressed by Dr. Shellman.  Dr. Shellman found that Plaintiff's shortness of breath was secondary to his obesity, and that his sleep-disordered breathing was adequately controlled on CPAP.  (Metz Aff. Ex. E at 1-2).  Although Dr. Shellman noted Plaintiff's depression and anxiety as possible contributing factors to his current physical state, there is no objective medical evidence in the record regarding this condition.  As noted earlier in this opinion, although Dr. Klinestiver opined that Plaintiff was incapable of working, the Company was entitled to credit Dr. Shellman's opinion over his.  *See Davis*, 444 F.3d at 576;  *Semien*, 436 F.3d at 812.  Thus, the court finds Dr. Shellman's IME provided a sufficient basis and rational support for the conclusion that Plaintiff was no longer entitled to short-term disability benefits under the Plan.

## V.      Conclusion

For the reasons explained above, the court hereby **GRANTS** Defendants' Motion

for Summary Judgment (Docket # 39) and **GRANTS** Defendants' Motion to Strike

Evidentiary Material Not Submitted to Plan Administrator (Docket # 78).


**SO ORDERED** this  7th   day of January 2008.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Electronic Copies to:

Kevin W. Betz
BETZ & ASSOCIATES
kbetz@betzadvocates.com

Julia F. Crowe
LOCKE REYNOLDS LLP
jcrowe@locke.com

Thomas E. Deer
LOCKE REYNOLDS LLP
tdeer@locke.com

Jamie A. Maddox
BETZ & ASSOCIATES
jmaddox@betzadvocates.com

Elizabeth Ann Mallov
BETZ & ASSOCIATES
emallov@betzadvocates.com